# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **DENNIS MICKJALE POTTS,** | Civil No.     13-0568 DMS (JLB) |
| **Petitioner,** | |
| | **REPORT AND RECOMMENDATION RE:** |
| **vs.** | **(1) DENYING PETITION FOR WRIT OF HABEAS CORPUS;** |
| **JEFFREY BEARD, Secretary,** | **(2) DENYING REQUEST FOR EVIDENTIARY HEARING; and** |
| **Respondent.** | **(3) ORDER DENYING REQUEST TO APPOINT COUNSEL** |

## I.    INTRODUCTION

Petitioner Dennis Mickjale Potts, a state prisoner proceeding pro se and in forma pauperis with a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254, challenges his conviction in San Diego County Superior Court Case No. SCD211145 for two counts of first degree special circumstances murder and one count of conspiracy to obstruct justice. (Pet. at 4-6, 10-62 ECF No. 1.)[1]  The Court has reviewed the Petition, the Answer and Memorandum of Points and Authorities in Support of the

---

[1] Page numbers for docketed materials cited in this Report and Recommendation refer to those imprinted by the Court's electronic case filing system.

Answer, the Traverse, the lodgments, the record, and all the supporting documents submitted by both parties.  For the reasons discussed below, the Court **DENIES** the request for appointment of counsel, and recommends the Petition and the request for an evidentiary hearing be **DENIED**.

## II.     FACTUAL BACKGROUND

This Court gives deference to state court findings of fact and presumes them to be correct; Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  *See* 28 U.S.C. § 2254(e)(1) (West 2006); *see also Parle v. Fraley*, 506 U.S. 20, 35-36 (1992) (findings of historical fact, including inferences properly drawn from these facts, are entitled to statutory presumption of correctness). The following facts are taken from the California Court of Appeal opinion:

> Potts and murder victim Tori Vienneau dated for about two months during their senior year in high school.  After they broke up, Potts dated Nicole Zolezzi who attended the same high school.  His relationship with Zolezzi continued after graduation. In 2005, Zolezzi moved into the Potts family home where Potts also lived with his parents. Potts and Zolezzi became engaged in 2006.

> For about six months after their high school graduation, Potts and Vienneau engaged in sexual intercourse about three or four times a month. Beginning in 2003, the two saw each other less frequently.

> Vienneau in 2004 moved in with her then-boyfriend Neil Springstube.  Springstube and Vienneau had a roommate named Daniel Moen.  In December 2004, Potts and Vienneau had sexual intercourse for what Potts claims was the last time.   In early 2005, Vienneau text messaged Potts she was pregnant. Later that year, Vienneau gave birth to a son she named Dean.

> In spring 2006, Springstube submitted a DNA sample to determine paternity.  The result of that test showed Springstube was not Dean's father.  Disappointed, Springstube left Vienneau and moved to Florida.

> With Springstube gone, Moen testified he began to spend more time with Vienneau and Dean.  Moen often babysat Dean when Vienneau was at work and he took care of Dean for about a week in spring 2006, when Vienneau traveled to Florida in an unsuccessful attempt to reconcile with Springstube. On her return from Florida, Moen and Vienneau gave notice under the lease; Moen moved in with his mother while Vienneau moved in with girlfriend Autumn Castellones (Autumn), Autumn's two young children and Autumn's sister Tricia Castellones (Tricia).

> Vienneau struggled financially as a single mother, particularly after Springstube moved away.  After learning that Springstube was not the

father, Vienneau asked Potts to take a paternity test. Although initially unhappy about taking the test and believing it was not possible for Dean to be his son, Potts agreed to take a mail-in paternity test. As it turns out, Potts submitted two tests and both showed he was not Dean's father.

When Vienneau learned Potts was also not Dean's father, she became upset. Vienneau believed that Potts had tampered with the test samples and insisted Potts take another paternity test supervised by the court. Potts was upset by Vienneau's request. Vienneau confided in her friends Potts had not told his fiancé or parents about Dean and the "paternity issue" involving Vienneau.

In the early evening of July 26, 2006, Vienneau and Dean were murdered in Autumn's apartment where Vienneau and Dean were temporarily living. Earlier that day, Vienneau spoke by phone to her good friend Tara Cardoso. Cardoso testified she and Vienneau talked for about 45 minutes, beginning around 12:30 p.m.

Vienneau told Cardoso that she (Vienneau) and Potts were having dinner together that night, Potts was going to pick up her and Dean from the apartment and Vienneau had arranged a babysitter for Dean. According to Cardoso, Vienneau intended to tell Potts at dinner that night that she (Vienneau) was taking him to court for paternity testing. During the call, Vienneau told Cardoso that Potts had no interest in being Dean's father.

Autumn testified she and Vienneau had been friends since about 2001. Autumn met Vienneau at work, where they also met Moen.

Moen testified his relationship with Vienneau blossomed over the years and they became best of friends. Their relationship was strictly platonic until five days before Vienneau was murdered, when Moen testified they had sexual intercourse for the first and only time. Because Moen was helping Vienneau take care of Dean, including driving Dean to daycare almost daily, and because he spent a significant amount of time with Vienneau parenting Dean, Moen testified he began to develop strong feelings for Vienneau and Dean.

Vienneau's mother, Dayna Herroz, testified that Moen, Vienneau and Baby Dean visited often. Herroz knew Moen from when he was roommates with Springstube and her daughter. Herroz described Moen as Dean's "other caretaker" and personally observed Moen had strong feelings for Vienneau and would do anything for Vienneau. Herroz testified that shortly before Vienneau's murder, Vienneau said Moen was in love with her.

Herroz also testified she had lunch with Vienneau on the day Vienneau was murdered. During their lunch, Vienneau confirmed she and Potts were having dinner together that evening.

The weekend before Vienneau was murdered, Herroz and her husband met with Vienneau and insisted Vienneau pursue court-ordered paternity testing because like Vienneau, Herroz believed Potts had tampered with the mail-in tests showing Potts was not Dean's father.

3

13cv0568

Vienneau responded she chose to have Dean and if Potts's family found out about the baby, according to Potts his life would be ruined.

Herroz believed there were only two possible fathers of Dean, as Vienneau had told her mother she had sexual intercourse with only Springstube and Potts at or near the time she became pregnant. Herroz firmly believed the time had come for her daughter to stop worrying about Potts and what his family knew or did not know about Dean, and believed if Potts was in fact the father, as Herroz surmised, that information should be made public. Vienneau told her mother she intended to tell Potts "in no uncertain terms" during their dinner on July 26 that Vienneau "was going to ask for a paternity test through the courts, because she believed he falsified the previous one."

Herroz testified and phone records showed that at 5:27 p.m., shortly before Vienneau's murder, Herroz and Vienneau spoke for about 12 minutes. During this phone conversation, Vienneau confirmed she was having dinner that evening with Potts. Phone records also show Potts called Vienneau at 5:39 p.m. on the night of the murders.

The babysitter, Cecily Bohrer, testified she worked with Herroz and babysat for Vienneau about eight to 10 times before the murders. Vienneau had called Bohrer a day or two before the murders and asked Bohrer to babysit Dean on the night of July 26 because Vienneau and Potts were having dinner together. As they had arranged, when Bohrer got home from work on July 26 she called Vienneau (at 5:42 p.m.) and told Vienneau she could drop off Dean. According to Bohrer, Vienneau said she needed "to do a couple of little things" and then she and Potts would bring Dean over to Bohrer's apartment.

On the evening of the murders, Moen was working his shift as supervisor at Savon (which later became CVS) in Chula Vista. Moen's shift typically was from 2:00 p.m. to 10:30 p.m. The store's video surveillance — which detectives described as antiquated — was not activated until 6:40 p.m. on the day of the murders, which store security said was not uncommon.

On the evening of the murders, Moen testified while on his break he briefly left work at around 5:20 p.m. to visit his mother in the hospital. Moen already had visited his mother in the hospital earlier that day. As Moen got into his car and began to drive, Moen decided he did not have sufficient time to visit his mother. Moen testified he stopped his car, parked in the store's parking lot and called Vienneau from inside his car. Moen testified he and Vienneau spoke for only a few minutes about "random things" before he went back to work.

Surveillance video from the store showed Moen inside the store beginning at 6:43 p.m. (after the video was turned on), where Moen remained until the store closed. Moen testified Autumn called him at about 9:15 p.m. that night and (as it turns out, incorrectly) informed him that Vienneau had killed Dean and then herself. After receiving the news about Vienneau and Dean, Moen called his store manager who gave Moen permission to close early. Moen called his brother, who met Moen

outside the apartment where Vienneau and Dean had been living and were found dead.

John Young was a detective in the San Diego Police Department homicide unit in July 2006. Young testified he interviewed Moen at the crime scene on the night of the murders and described Moen as "very distraught." During a later interview that night in the interview room at the San Diego Police Department, Moen told Young he had begun work at 2:00 p.m. the previous day. Young interviewed two other Savon employees who had worked with Moen on the day of the murders and corroborated Moen's story.

A few days later, Moen called Young and volunteered that on the evening of the murders Moen had left the store at about 5:20 p.m. for about 10 or 15 minutes. As a result of this new information, Detective Young analyzed the surveillance video from the store and determined that at 6:53 p.m., the same time Moen received a final text message from Vienneau's phone, Moen was inside the store working.

Detective Young testified the distance between the Savon where Moen worked and the apartment where Vienneau was living was about 10 miles each way and the drive took at least 35 minutes roundtrip. Because Moen was working at 6:53 p.m. when he received the final text message from Vienneau's phone and because Vienneau's phone was found next to her body inside the apartment, Detective Young concluded Moen was not the murderer.

As part of his investigation, Detective Young analyzed the phones and/or the phone records of various individuals, including Moen and Vienneau. At 5:50 p.m. on the evening of the murders, Moen texted Vienneau that he was "sorry [he] was mean" to Vienneau and he should have "been more supportive" of her. Moen testified his 5:50 p.m. text message to Vienneau was in connection with a six-minute telephone conversation between him and Vienneau that occurred earlier, while Moen had sat in his car outside the store on his break. According to Moen, during that telephone conversation he told Vienneau he did not want Potts to have any contact with Dean.

Moen received a text back from Vienneau's phone saying, "It's okay. I'm just teasing you." Two minutes later, Moen texted Vienneau, "Okay. I'm sorry, though. I make up the past every day." At 5:54 p.m., Moen received a text from Vienneau's phone, "I know. You don't have to." At 5:57 p.m., Moen texted Vienneau, "Yeah, I want to." At 6:03 p.m., Moen wrote Vienneau a long text stating in part, "I'm sorry for hurting you and pushing you away. I really do love you and want to be with you. Love you."

Moen testified the next series of texts he received from Vienneau's phone were "fishy" and "out of the ordinary" from her previous text messages. At 6:10 p.m., Moen received a text from Vienneau's phone stating, "Dean is sleeping like a dead dog." At 6:27 p.m., Moen received another text from Vienneau's phone stating, "I canceled on Dennis [Potts]. Come by when you get off." At 6:32 p.m., Moen replied, "I didn't know he was coming over." At 6:39 p.m., Moen received a text in response, "Yeah." At 6:48 p.m., Moen texted Vienneau, "Oh, why [did] you

cancel?"  In reply Moen received a text from Vienneau's phone, "Didn't want to see him."  At 6:50 p.m., Moen replied, "You'd rather see me."  The response from Vienneau's phone was, "duh."  Moen then texted Vienneau at 6:51 p.m., "Hee, hee. What time was he coming over?"  At 6:53 p.m., the last text sent from Vienneau's phone read, "There's some scary guy standing by my car looking into my place."

At 7:05 p.m., Moen texted Vienneau back, "Yikes. What time was he coming?"  At 7:09 p.m., Moen again texted Vienneau, asking "Is the guy still there?"  At 7:19 p.m., Moen texts Vienneau, "You there?"  An hour later, Moen tried to call Vienneau from the Savon phone, but nobody answered.  The next text Moen received was from Autumn, advising Moen about an emergency involving Vienneau.

Moen and Herroz both testified that Vienneau would never say Dean was sleeping "like a dead dog" and would never have referred to Autumn's apartment as "my place" (in connection with the stranger standing outside her car) because Vienneau appreciated it was Autumn's apartment, Autumn was letting Vienneau and Dean stay in the apartment temporarily and Autumn paid the rent.  Moen also testified that in the six years he and Vienneau texted she had never used the word "duh" in a text message.

Michael Morgan, an expert in digital forensics, testified he recovered text messages sent by Potts to Vienneau that had been "deleted" (e.g., no longer in the active memory) from her phone.  One such recovered message was sent on July 25, 2006, when Vienneau received a text message from Potts's phone reading, "Hmmm, I don't think you could.  I'm jealous, hehehe. I totally want to be sitting with you in between my legs and me holding you so comfortable."

In addition, Richard Wissemann, a criminal investigator for the People, testified he reviewed the text message data from Vienneau's phone and found there were 26 messages — including the deleted messages — between Potts and Vienneau on the day of the murders.  At 4:32 p.m. that day, Vienneau texted Potts saying, "You still coming?"  A minute later, Vienneau received a response (recovered by the digital forensic specialist) from Potts's phone stating, "Duh, I['ll be there at 5:15. You home alone?"  In reply, Vienneau sent Potts a message, "Yeah. Just Dean and I.  Is my surprise good?"

At 4:35 p.m., Vienneau received a response from Potts's phone that was also recovered by the forensics expert that read, "Yes.  Hehehe.  It will be in my car.  But there's something I want to tell you that you'll like.  Where's Autumn's sister?"  Vienneau replied, "I'm not sure. She could be in her room. I don't know.  What did you want to tell me?"  At 4:41 p.m., Vienneau texted Potts," Oh, God, please tell me it's not a paternity test because I want to forg[e]t about it for one night."  Vienneau received a response at 4:43 p.m. from Potts's phone (also recovered by experts) that said, "Baby, relax, it's not.  Just smile and wait for me to come over and be extra nice to me.  I'll call you when I'm almost there."  Vienneau responded, "Okay."

/ / /

6

13cv0568

Investigator Wissemann testified phone records showed a phone call was placed from Potts's phone to Vienneau's phone at 5:39 p.m. on the evening of the murders.

Tricia testified she was living in an apartment with her sister Autumn and her sister's two children at the time of the murders. Vienneau and her son also were living temporarily in the apartment. Vienneau slept on the couch in the living room and Dean typically slept in his playpen in the hallway or in Autumn's room if Autumn was not at home. Tricia estimated that Vienneau and her son had been living in the apartment about a month before they were murdered.

On the day of the murders, Tricia testified she came home around 1:00 p.m. While she was making herself lunch, Vienneau and her son returned to the apartment. Tricia ate in her bedroom and later, with her door closed, fell asleep in her room while watching television. After sleeping for a few hours, Tricia awoke on her own shortly before 7:00 p.m. From the minute she awoke, Tricia did not recall hearing any noise from inside the apartment. She testified that even with her bedroom door closed, she typically could hear conversations emanating from the living room, the hallway and even from her sister's separate bedroom.

After a few minutes, Tricia went to the kitchen. On her way, Tricia saw Vienneau sitting on the floor with her back against the couch. Vienneau was partially covered by a blanket or towel. Tricia described the apartment as appearing "normal." Tricia returned to her room, made a few telephone calls and then left to get some gas in her car.

When Tricia returned to the apartment, she found Vienneau had not moved. Tricia also noticed for the first time a "red spot" on the back cushion of the new couch. Tricia called Vienneau's name a few times and when Vienneau did not respond, Tricia walked over to Vienneau and lifted the blanket/towel partially covering Vienneau. Tricia saw the cord to her hair-straightening iron, which Tricia had left on the end table in the living room, wrapped tightly around Vienneau's neck. Tricia next ran down the hall to check on Dean. Tricia opened Autumn's door and found Dean also dead. Tricia ran out of the apartment and called 9-1-1. She then called Autumn.

Police responded to Tricia's call at about 8:54 p.m. Tricia met the police at the front gate, which was closed. According to police, Tricia was hysterical as she described the scene inside the apartment. Police were forced to park their vehicles outside the apartment complex because Tricia did not have a device that opened the secured, sensor-activated gate. Tricia directed police to the third floor apartment.

San Diego Police Officer Victor Rodriguez testified he opened the front door to the apartment and found no evidence of a forced entry or tampering. The front door to the apartment also had a working "peephole." Officer Rodriguez walked over to Vienneau and observed a cord wrapped about four times around her neck. Officer Rodriguez noticed Vienneau was not breathing and saw the cord was wrapped so tightly it was actually embedded into Vienneau's neck. At that point, Officer Rodriguez believed Vienneau had been murdered.

13cv0568

Officer Rodriguez drew his revolver and went room-to-room looking for suspects and other victims. When he opened the door to what turned out to be Autumn's darkened room, Officer Rodriguez found an "infant," later identified as Dean, dead inside the playpen. Dean had a telephone cord also wrapped about four times around his neck.

San Diego Police Detective John Tefft investigated the crime scene. He testified that because the apartment was on the third floor, there was no way anybody could climb through a window to gain access to the apartment, since it was a "sheer drop" down to the ground. Detective Tefft found a diaper bag filled with diapers and similar objects next to Vienneau's body. About a foot away from Vienneau was her cell phone, among other items. He noted there were no signs of a struggle, as the living room was not in disarray and the only furniture overturned in that room was a small child's stool.

Detective Tefft found one of Vienneau's legs was unclothed, while the other leg was partially clothed by her jeans. Vienneau's underwear was down to her knees. Vienneau's blouse was torn, but she was still wearing her bra.

Detectives later determined the crime scene had been staged by Vienneau's attacker to make it appear that Vienneau had been the victim of a sexual assault. Detectives came to this conclusion because their investigation showed no physical evidence to support a sexual assault, such as semen or ejaculate on Vienneau's jeans or underwear, or the floor in the living room.

Detective Tefft found there was blood on Vienneau's head, but none on her hands or feet. Detective Tefft testified this finding was significant because most people when they are injured will instinctively use their hands to touch the injury, resulting in a transfer of blood. Detective Tefft also found no evidence of any "defensive wounds" on Vienneau's hands or forearms, or evidence she was involved in fighting with her attacker (e.g., broken nails).

As for Dean, Detective Tefft said the child had been strangled with a phone charging cord that was wrapped around the baby's neck and tied to the rail of the playpen.

Chief Medical Examiner Glenn Wagner testified Vienneau sustained a deep laceration to the back of her scalp that caused profuse bleeding. In addition, during the autopsy Wagner discovered a blunt force injury near Vienneau's left ear. Wagner found bleeding on Vienneau's brain from both areas of impact. Wagner surmised the laceration was caused by an instrument of some sort, while the contusion near Vienneau's ear likely was caused by a body part striking the head, such as a fist, a hand or a knee. Wagner also found blunt force trauma to the front of Vienneau's head.

As a result of the presence of petechia or small, pinpoint hemorrhages on her face, Wagner surmised Vienneau was alive when the ligature was wrapped around her neck. Wagner found no evidence Vienneau fought back or was conscious when she started to bleed, and

8

opined the blunt force injuries rendered her unconscious and she either fell or was placed against the couch, where she was strangled.

Wagner testified that from the condition of Vienneau's clothing it initially appeared she had been the victim of an attempted sexual assault. However, his physical examination showed no evidence to support such an attack.  Wagner noted there was no evidence of any sexual assault involving the mouth, the rectum or the vagina either on gross or microscopic examination. FN3  He also noted the location of Vienneau's body on the floor and against the couch was not consistent with a sexual assault.

> FN3. Forensic investigators found low levels of spermatozoa matching Moen's DNA profile in Vienneau's vagina. However, the low sperm count in Vienneau's vagina was consistent with the semen having been deposited a few days before the murders.

As to Dean, the cord around his neck was tied with a "granny" or "overhand" knot as opposed to a square knot that was used to tie the electrical cord around his mother's neck.  Based on the medical evidence, Wagner opined the electrical cord was applied to Dean while he was standing up in the playpen.  Over time, as Dean became fatigued and sat down, he hanged from the cord.

At about 2:45 a.m. on July 27, 2006, San Diego Police homicide detective Joseph Cristinziani, two other detectives and a police sergeant went to the Potts family's home to interview Potts.  Before they contacted Potts, the detectives informally agreed not to mention to Potts that Dean also had been murdered.

During the interview, Potts told detectives he and Vienneau were long-time friends and were physically intimate at one point but not for about a year or two.  Potts told police he last saw Vienneau on July 20, when they discussed getting together after Potts returned from a trip to Las Vegas.  Potts said he and Vienneau exchanged several text messages the day before, but Potts erased those messages because he did not want his fiancé to view them.

Potts told the detectives he left his house at about 5:00 p.m. the evening before to visit his friend Maxwell Corn (Max).  Potts went to Max's house to review surveillance video taken from security cameras at the Potts home to catch the person stealing the family's newspaper. According to Potts, Max had computer software that would allow them to review the surveillance video taken by the Pottses' security cameras. Potts told detectives he stayed at Max's house until about 8:00 p.m., then left and went straight home where he remained the rest of the evening.

Potts told detectives he and Vienneau did not have dinner plans the evening before.  Potts explained he and Vienneau did have a "casual conversation" where they discussed "just going to simply hang out" together, but their plans were "not set in stone."  When detectives followed up and asked Potts whether he and Vienneau had made dinner plans the night before, Potts adamantly denied making any such plans with Vienneau.  Potts also told detectives it was Vienneau who had

decided the evening before she did not want to get together with Potts. According to Potts, Vienneau instead decided to take Dean to the babysitter and to text Moen at work about hanging out together later that night.

In response to questions about paternity testing, Potts admitted to detectives he had taken a paternity test that showed he was not Dean's father.  Detective Cristinziani testified that during the entire 20-minute interview, Potts never once asked about the welfare of Dean.

Detective Cristinziani next interviewed Potts at the police station on July 28, 2006, and took a DNA sample from Potts. FN4  During this interview, Potts maintained Vienneau had cancelled their tentative plans the evening she was murdered and denied he was angered by her request he take another paternity test, stating he would be "really, sincerely surprised" if he was the father of Dean.

FN4. That interview was recorded on video and was played at trial for the jury. The video was made a part of the record pursuant to the People's unopposed request to augment.

On the morning of September 13, 2006, Detective Tefft executed a search warrant at the Potts family home seeking items related to paternity, Potts's relationship with Vienneau and Potts's computer and digital camera, among other items.  Potts denied having the paternity paperwork at the house and told detectives he had erased from his computer any information sought in the warrant.  Detectives nonetheless seized a standard desktop computer from Potts's bedroom and a laptop computer from the family's living room.

During execution of the search warrant, Detective Cristinziani asked Potts directly if Potts had tampered with the previous paternity test that showed Potts was not the father of Dean. Potts denied any tampering and said he sent in his own DNA for testing.  In response, Detective Cristinziani told Potts that police had conducted their own paternity test and it showed that Potts was in fact Dean's father.  Potts appeared shocked by the news and denied he was the father.  Potts also denied loaning his cell phone to anyone on the day of the murders and confirmed he was at Max's house that evening between 5:00 and 8:00 p.m.

Detective Cristinziani told Potts police had obtained Potts's cell phone records and cell tower information from July 26, 2006, and determined Potts was "pinging" from cell towers that were inconsistent with Potts's statement he never left Max's house between 5:00 and 8:00 p.m.  Potts responded the information provided by the phone company must have been wrong.  Potts also again denied having any dinner plans that night with Vienneau, suggested Vienneau was a "flake" and said that is why they had not seen each other on the night of the murders.

Next, despite his earlier statement to police, Potts said he had received only one text message from Vienneau on the day of the murders and that he had not texted her back.  Detective Cristinziani told Potts that the phone records showed just the opposite, that there had been phone calls and myriad text messages between Potts and Vienneau on July 26, 2006.

10

As part of his investigation, Detective Cristinziani obtained from the company the swabs and documents Potts submitted for the mail-in paternity testing. Detective Cristinziani testified Potts actually submitted two applications for paternity testing, with each test costing $245. Phone records showed Potts called the testing company for results on July 17 and again on July 19, 2006. Cell phone records also showed that Potts called the company four times before he was interviewed by detectives on July 28, 2006, just two days after the murders.

Detectives interviewed Max Corn in late September 2006. Max adamantly denied submitting his DNA in place of Potts's in connection with the paternity testing of Baby Dean. Max also remained steadfast that he and Potts were together at Max's residence between 5:00 and 8:00 p.m. on the evening of the murders. Detectives collected a DNA sample from Max and later determined the DNA submitted by Potts for the paternity testing in fact matched Max's DNA. FN5

> FN5. Max was subsequently convicted for conspiracy to obstruct justice. His conviction is not the subject of this appeal.

A computer forensic expert examined the hard drive of the computer taken from Potts's bedroom during execution of the search warrant. The expert, Robert Petracheck, found the following Internet searches deleted from the hard drive of Potts's computer: (1) "committing murder" (June 24, 2006); (2) "where are court-ordered paternity test conducted" (same); (3) "court-ordered paternity test procedure" (June 26, 2006); (4) "how to cheat a swab paternity test" (same); (5) "best way to kill someone" (June 28, 2006); (6) "getting away with murder" (June 30, 2006); (7) "getting out of child support" (July 7, 2006); (8) "performing choke hold" (July 19, 2006); (9) "how to kill someone" (same); (10) "how did you get away with murder" (same); (11) "knocking someone unconscious" (July 25, 2006); and (12) "knocking someone in the head" (same).

Petracheck also testified that on August 8, 2006, 20 pages of phone records from Potts's cell phone were downloaded onto Potts's computer from the cell phone company's website. A day later, two entries on page 17 of the downloaded document had been opened and altered. Specifically, the call log was changed to show that calls at 5:39 p.m. and 6:44 p.m. on the evening Vienneau was murdered were made from Chula Vista rather than from Bonita. The altered version of that document was saved on and printed multiple times from Potts's computer and, according to Petracheck, when printed looked identical to the original log.

Petracheck also testified that from the printer cue (e.g., the mechanism by which the computer manages print jobs), he determined that two print jobs printed in sequence before the altered phone records were the paternity testing results.

Finally, Petracheck testified that Potts's computer was equipped with two video processing applications, one of which he described as "professional grade" software that was used in the movie industry for editing of motion pictures. Petracheck noted as part of his investigation he also had reviewed a computer retrieved by police from Max's residence

13cv0568

and found a computer program known as "Pinnacle" had been installed on that computer beginning shortly after 5:00 p.m. on the evening of the murders. Petracheck testified the program installation was completed at about 7:10 p.m. later that evening, but the software program was never used.

Investigators determined from Potts's cell phone records that between about 5:00 pm. and 8:00 p.m. on the day of the murders all calls made or received by Potts on his cell phone were routed through cell tower number 814, with the exception of one call at 6:44 p.m. that was routed through cell tower number 425. Dennis McColl, a senior engineer, testified that cell tower 425 was located about .6 miles from the apartment where Vienneau was murdered. McColl further testified that if Potts had been at Max's residence at 6:44 p.m. when Potts received that call (from his mother), it would have been routed through cell tower 814 or possibly through cell tower 357, but that it would have been "next to impossible" for a cell phone user to receive a call at Max's residence that had been routed through cell phone tower 425.

(Lodgment No. 6 at 2-21.)

## III.   PROCEDURAL BACKGROUND

On January 16, 2008, the San Diego County District Attorney's Office filed an Information charging Dennis Mickjale Potts with two counts of murder, a violation of California Penal Code (Penal Code) § 187(a) and one count of conspiracy to obstruct justice, a violation of Penal Code § 182(a)(5).  (Lodgment No. 1 at 0093-95.)[2]  The Information also charged a special circumstance allegation that Potts committed multiple murders.  (*Id.*)

Following a jury trial, a jury found Potts guilty of all counts and found the special circumstance to be true.  (Lodgment No. 1 at 0249-51.)  Potts was sentenced to life without the possibility of parole on counts one and two, to be served consecutively, and three years in prison on the obstruction of justice count, also to be served consecutively.  (*Id.* at 0254.)

Potts filed a direct appeal and concomitant petition for writ of habeas corpus of his conviction to the California Court of Appeal, Fourth Appellate District, Division

/ / /

---

[2] Max Corn was Potts' codefendant on the obstruction of justice count at the time.  (*See* Lodgment No. 1 at 0093.)

One.  (Lodgment Nos. 3-5.)  The state appellate court affirmed the convictions in an unpublished written opinion which addressed both the direct appeal and the habeas corpus petition.  (Lodgment No. 6.)

Potts then filed a Petition for Review in the California Supreme Court, which denied the petition without citation of authority.  (Lodgment Nos. 7-8.)  Potts filed a second habeas corpus petition in the California Supreme Court, which also denied the petition without citation of authority.  (Lodgment Nos. 9-10.)

Potts filed a Petition for Writ of Habeas corpus pursuant to 28 U.S.C. § 2254 in this Court on March 11, 2013 [ECF No. 1].[3]  Respondent filed an Answer and Memorandum in Support of the Answer on August 16, 2013 [ECF No. 16].  Potts filed a Traverse on November 12, 2013 [ECF No. 21].

## IV.   DISCUSSION

Potts raises four claims in his Petition.  First, he claims the state trial court abused its discretion and violated his federal due process rights to a fair trial by denying a motion for a mistrial.  Second, he contends trial counsel was ineffective.  Third, Potts argues his appellate counsel was ineffective.  Fourth, he claims the prosecutor committed misconduct during closing argument.  (Pet. at 4-6, 14-61, ECF No. 1.)  Respondent argues the state court's resolution of the claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 8-19, ECF No. 16.)

A.  *Standard of Review*

This Petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320 (1997).  Under AEDPA, a habeas petition will not be granted with respect to any claim adjudicated on the merits by the state court unless that adjudication: (1) resulted in a decision that was contrary to, or involved an unreasonable application of clearly

---

[3] Potts initially filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2241, which the Court construed as a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. (*See* ECF No. 4.)

established federal law; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 28 U.S.C. § 2254(d); *Early v. Packer*, 537 U.S. 3, 8 (2002). In deciding a state prisoner's habeas petition, a federal court is not called upon to decide whether it agrees with the state court's determination; rather, the court applies an extraordinarily deferential review, inquiring only whether the state court's decision was objectively unreasonable. *See Yarborough v. Gentry*, 540 U.S. 1, 4 (2003); *Medina v. Hornung*, 386 F.3d 872, 877 (9th Cir. 2004).

A federal habeas court may grant relief under the "contrary to" clause if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *See Bell v. Cone*, 535 U.S. 685, 694 (2002). The court may grant relief under the "unreasonable application" clause if the state court correctly identified the governing legal principle from Supreme Court decisions but unreasonably applied those decisions to the facts of a particular case. *Id.* Additionally, the "unreasonable application" clause requires that the state court decision be more than incorrect or erroneous; to warrant habeas relief, the state court's application of clearly established federal law must be "objectively unreasonable." *See Lockyer v. Andrade*, 538 U.S. 63, 75 (2003).

Where there is no reasoned decision from the state's highest court, the Court "looks through" to the underlying appellate court decision and presumes it provides the basis for the higher court's denial of a claim or claims. *See Ylst v. Nunnemaker*, 501 U.S. 797, 805-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law. *See Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by *Andrade*, 538 U.S. at 75-76); *accord Himes v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003). However, a state court

1   need not cite Supreme Court precedent when resolving a habeas corpus claim.  *See*

2   *Early*, 537 U.S. at 8.  "[S]o long as neither the reasoning nor the result of the state-court

3   decision contradicts [Supreme Court precedent,]" *id.*, the state court decision will not

4   be "contrary to" clearly established federal law.  *Id.*  Clearly established federal law,

5   for purposes of § 2254(d), means "the governing principle or principles set forth by the

6   Supreme Court at the time the state court renders its decision."  *Andrade*, 538 U.S. at

7   72.

8            B.  *Denial of the Motion for Mistrial/Due Process (claim one)*

9            In claim one, Potts contends the trial court improperly denied his motion for a

10  mistrial and that the denial violated his federal due process rights to a fair trial.  (Pet.

11  at 4, 14-28, ECF No. 1; Traverse at 8-11, ECF No. 21.)  Potts' attorney made the

12  motion for a mistrial when it was discovered mid-trial that, contrary to both the

13  prosecutor's and defense attorney's belief, it was possible to determine when text

14  messages were sent from Vienneau's phone not just when those messages were read

15  by Moen.  (Lodgment No. 2, vol. 7 at 1153-55; vol. 8 at 1361.)  Up until that point,

16  counsel had built his defense on the argument that Moen could have killed Vienneau

17  and Dean, sent the messages from Vienneau's phone to himself, then read the texts

18  while he was visible on the surveillance camera at work.  (Lodgment No. 2, vol. 7 at

19  1156-58.)  When it was revealed that Vienneau's phone could conclusively show the

20  texts were sent while Moen was on the surveillance video, counsel moved for a mistrial

21  because, according to counsel, the new information eviscerated his defense because it

22  showed Moen was "factually innocent." (Lodgment No. 2, vol. 8 at 1361-62, 1371-74.)

23  In the alternative, counsel asked the trial judge to exclude the newly acquired

24  information about Vienneau's phone because it would deprive Potts of a fair trial.[4]  (*Id.*

25  at 1371-74.)  The trial judge denied the motion.  (*Id.* at 1375.)

26  _____

27  [4] Petitioner here concedes, as he did in his Petition for Review to the California Supreme Court
    on direct review, that the text time-stamp evidence was properly admitted at trial and Respondent
    committed no discovery violations with respect to the evidence.   (Pet. at 23, ECF No. 1; Lodgment

28  No. 7 at 13, 16.)

Potts contends the denial of the mistrial motion violated his right to a fair trial because the newly discovered evidence "completely gutted the defense case that had been built, [starting] during jury selection, and continuing through opening statements and then throughout the prosecution's case." (Pet. at 20, ECF No. 1.)  Respondent counters that the state court's resolution of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 8-11, ECF No. 16.)

Potts raised this claim in the Petition for Review he filed in the California Supreme Court on direct review. (Lodgment No. 7.)  That court denied the petition without citation of authority. (Lodgment No. 8.)  Accordingly, this Court must "look through" to the state appellate court's opinion denying the claim as the basis for its analysis. *Ylst*, 501 U.S. at 805-06.  That court wrote:

> As Potts notes in his brief, the trial court *properly* admitted the "timing evidence" taken from Vienneau's cell phone discovered mid-trial by the People showing the actual times the final text messages were sent from her phone and received by Moen on the night of the murders.  In addition, as Potts also notes the prosecution did *not* violate the discovery disclosure rules in connection with the discovery of such evidence.
>
> The evidence was properly uncovered during trial that *may* have undermined Potts's third party culpability defense involving Moen does not mean Potts was prejudiced in a constitutional sense or otherwise received an unfair trial.  There being no error, we conclude the trial court properly exercised its discretion in denying Potts's mistrial motion.
>
> As a threshold matter, we note that even before the "timing evidence" from Vienneau's cell phone was discovered, Potts's third party defense theory involving Moen was tenuous.  The evidence from the video surveillance equipment place Moen at work at 6:43 p.m., at or near the critical time police estimated Vienneau and Baby Dean were murdered.  Phone records show text messages were exchanged between Moen and Vienneau's phone both before and after 6:43 p.m.
>
> The appellate court record also shows the apartment where Vienneau was living was about 10 miles from Moen's work, the drive from Moen's work to the apartment and back took at least 35 minutes and that Moen received a final text message from Vienneau's phone at 6:53 p.m. regarding the "scary guy" standing by her car looking into "my place."
>
> We further note that when the defense proffered its theory that Moen murdered Vienneau and Dean and sent himself text messages from Vienneau's phone to cover up that crime, the defense unequivocally stated

it would *not* be relying on expert testimony to support this theory, which was *crucial* to its third party culpability defense involving Moen. Thus, the defense never sought to offer any evidence to show how Moen allegedly was able to alter the times of the text messages he allegedly sent himself from Vienneau's phone, after he allegedly killed Vienneau and Dean, so they were recorded as being received by Moen after he returned to work, turned on the video surveillance equipment in the store and purposely looked into the camera with his phone in hand to verify for anyone who subsequently viewed the video he was in fact inside the store at 6:43 p.m. that night.

In any event, the record shows the defense was *not* precluded from presenting its third party culpability defense and arguing at closing this defense created reasonable doubt to acquit Potts of the murders. The record shows the defense focused suspicion on Moen, claiming Moen finally "snap[ed]" when he and Vienneau had sexual intercourse a few days before the murders only to be rejected by Vienneau afterwards because of his weight.

What's more, the defense argued that two days before she was murdered Vienneau told Moen she was hanging out with an old boyfriend, which the defense claimed enraged Moen even though Moen testified "he wasn't bothered by it." The defense also noted the physical evidence linked Moen, and not Potts, to the murders.

Specific to the issue at hand, the defense also argued during closing that the timing of the text messages sent from Vienneau's phone to Moen did not establish Moen's factual innocence to the murders:

"One of the most important things to remember is that there's no way to validly compare the timing of the text[s] for a couple of different reasons. No. 1, Mr. Moen's phone was never taken for forensic analysis. For whatever reason, Detective Young, even though he looked at the phone on the night of the 26th, he gave it back [to Moen] about . . . eight hours later. It was never examined by the Department of Homeland [S]ecurity . . . . That would be a way to forensically tell the exact timing of things . . . [but] that phone was never taken in for analysis.

"Is it possible that someone helped Moen by doing these so-called fake texts from [Vienneau's] phone between 6:27 and 6:53 p.m.? . . . . All of you who have texted for a least a couple of months know that sometimes you'll be texting back and forth with a friend and you won't hear from that friend for a while. Two or three hours may go by and then you'll get four or five texts in a row. I'm sure all of you have dealt with that at some time or another. And sometimes a week will go by and you'll get ten or twelve texts at a time . . . . You cannot claim that Danny Moen is factually innocent based on these text records alone. It's just not true."

Thus, the record shows that the defense presented the jury with its third party defense theory involving Moen and aggressively argued during closing that Moen was not factually innocent. As the fact finder, the jury was entitled to reject that defense, as turned out to be the case here. (See *People v. Smith* (2005) 37 Cal.4th 733, 739 [a court of review is bound to accept the factual and credibility determinations of the trier of fact].)

17

1          We thus conclude the trial court properly exercised its discretion in
2     denying Potts's mistrial motion because the admission of the "timing
      evidence" from Vienneau's phone in no way damaged, much less
      irreparably damage[d]" Potts's chances of receiving a fair trial. (See
3     *People v. Silva* (2001) 25 Cal.4th 345, 372-373.)

4     (Lodgment No. 6 at 31-34.)

5          Potts does not contend that the evidence was admitted in violation of state law

6     (Pet. at 23, ECF 1), but even if he did, he would not be entitled to relief. State

7     evidentiary rulings are not generally subject to federal habeas review. *Estelle*, 502 U.S.

8     at 70. *Id.* Further, to the extent Potts argues the trial court improperly denied his

9     mistrial motion based on state law grounds, he is not entitled to relief. *Estelle v.*

10    *McGuire*, 502 U.S. 62, 67-68 (1991) (holding that federal habeas relief is not available

11    for alleged violations of state law); *see also* 28 U.S.C. § 2254(a). The improper denial

12    of a mistrial motion can rise to the level of a federal due process violation, however,

13    if a petitioner can show the admission or denial rendered the trial "fundamentally

14    unfair." *Id.*; *Ortiz-Sandoval v. Gomez*, 81 F.3d 891, 897 (9th Cir. 1996).

15         Potts's contention is that, once the time-stamp evidence was discovered, its

16    admission (though proper) gutted his defense and rendered his trial fundamentally

17    unfair. (*Id.* at 14-28.) Simply because evidence favorable to the prosecution was

18    discovered late in the trial does not render its admission "fundamentally unfair,"

19    however. And, as the state court noted, Potts' defense was built on shaky ground even

20    before the text message timing evidence was discovered. Potts had both the motive —

21    a desire to prevent his relationship with Vienneau and his paternity of Dean to come

22    to light — and the opportunity — recovered text messages, independent witnesses, and

23    cell tower evidence established Potts was planning to meet Vienneau at the time of the

24    murders and his cell phone "pinged" off a tower only .6 miles from Vienneau's

25    apartment at the time the murders were believed to have been committed — to commit

26    the murders. (*See* Lodgment No. 2, vol. 3 at 309-12, 331; vol. 7 at 1216-19, 1230-32;

27    vol. 9 at 1695-97.) In contrast, by all accounts, Moen was in love with Vienneau and

28    loved Dean as well. (Lodgment No. 2, vol. 3 at 409-12; vol. 9 at 1693.) The theory

that Moen killed Vienneau because he was angry with her rejection of him did not account for the murder of Dean. Moreover, the explanation for Moen's appearance on the video surveillance tape at Savon shortly after the murders were believed to have been committed — that he murdered Vienneau and Dean, sent himself text messages from Vienneau's phone, then viewed them while he was on the surveillance tape — was a very difficult theory to sell to the jury, even without the newly discovered evidence. This was particularly true given the distance between Moen's work and Vienneau's apartment and co-worker's testimony that Moen was not gone more than 15 minutes during his shift. The distance to and from Vienneau's apartment is a minimum of 35 minutes. (Lodgment No. 2, vol. 5 at 749.)

The discovery of the text message timing information was undoubtedly damaging to Potts' defense, but did not render his trial "fundamentally unfair." Trial strategies, by their nature, are subject to mid-stream adjustments depending on how evidence comes across to a jury, how witnesses testify or are impeached, or the discovery of new information along the way. That is the nature of the adversary process. The evidence was relevant and admissible, as Potts himself admits.

For the foregoing reasons, the Court concludes the state court's denial of the claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law, and did not involve an unreasonable determination of the facts in light of the evidence presented. *Williams*, 529 U.S. at 412-13. Potts is not entitled to relief as to this claim.

## C. *Prosecutorial Misconduct (claim four)*[5]

In claim four, Potts argues the prosecutor "impermissively vouched for the credibility and degree of skill that its own expert witness possessed, during his Closing Arguments to the jury[.] Petitioner was thereby denie[d] his rights to a fair trial and due process of law." (Pet. at 56, ECF No. 1.) Specifically, Potts alleges the prosecutor

---

[5] The Court will address the prosecutorial misconduct (claim four) out of order and before Potts' ineffective assistance of trial counsel claim (claim two) because Potts contends trial counsel was ineffective for failing to object to the prosecutor's misconduct.

13cv0568

vouched for the credibility and skill of the cell tower expert, Dennis McColl, by stating that "[w]hen you have an opportunity to examine and look at the qualifications and whose experience and expertise to rely on, Mr. McColl's expertise in this area is probably unparalleled as it relates to this cell tower stuff." (Pet. at 56, ECF No. 1; Lodgment No. 2, vol. 9 at 2156.) Respondent contends the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 17-19, ECF No. 16.)

Potts raised this claim only in the second habeas corpus petition he filed in the California Supreme Court following the denial of his direct appeal. (Lodgment No. 9 at 5, 30-34.)   The California Supreme Court denied the petition without citation of authority. (Lodgment No. 10.)  Accordingly, this Court must conduct an independent review of the record to determine whether that denial was contrary to, or an unreasonable application of, clearly established Supreme Court law. *Himes*, 336 F.3d at 853.

"As a general rule, a prosecutor may not express his opinion of the defendant's guilt or his belief in the credibility of government witnesses." *United States v. Molina*, 934 F.3d 1440, 1444 (9th Cir. 1991) (citing *United States v. McKoy*, 771 F.2d 1207, 1210-11 (9th Cir. 1985)). A prosecutor commits misconduct ("vouching") when he or she "plac[es] the prestige of the government behind the witnesses through personal assurances of their veracity or [by] suggesting that information not presented to the jury supports the witnesses' testimony . . . ." *Id.* at 1445 (citing *United States v. Wallace*, 848 F.2d 1464, 1473 (9th Cir. 1988)).   However,  "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "It is not enough that the prosecutor's remarks [or actions] were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, a prosecutor commits misconduct when his or her actions "'so infect . . . the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v.*

*DeChristoforo*, 416 U.S. 637 (1974).)  "Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is 'the narrow one of due process, and not the broad exercise of supervisory power.'"  *Id.* (quoting *Donnelly*, 416 U.S. at 642).

The prosecutor in Potts' case did not vouch for McColl.  He did not "place the prestige of the government through personal assurances of [his] veracity," but only argued to the jury that when they compared Snavely and McColl's expertise and experience, they would find McColl was a more reliable witness than Snavely.  The prosecutor's statements, in context, are as follows:

> [THE PROSECUTOR]: Now, Mr. Snavely, the defense expert. We had a conference call with Mr. Snavely in July of this year, 2009, where Mr. McColl sat down in a conference setting with myself, Mr. Armstrong, and Snavely was on the phone.  And Mr. Snavely was allowed to ask any questions that he felt was appropriate, to make any suggestions he felt was appropriate, to volunteer any criticisms if he felt that was appropriate.
>
> His response was that the efforts Mr. McColl had gone to was exhaustive, had no suggestions for any additional experiments to conduct, no criticisms of the work done.  The work that Mr. McColl did in this matter was exemplary, and you should consider that.
>
> Mr. Snavely didn't conduct a single experiment, didn't have a single suggestion for an experiment to conduct.  Just came in here and said, "It's unlikely.  It's possible.  It's unlikely."  I think it was his conclusion in this area.
>
> *When you have the opportunity to examine and look at the qualifications and whose experience and expertise to rely on, Mr. McColl's expertise in this area is probably unparalleled as it relates to this cell tower stuff.*

(Lodgment No. 2, vol. 9 at 2155-56) (emphasis added.)

"[I]n fashioning closing arguments, prosecutors are allowed reasonably wide latitude and are free to argue reasonable inferences from the evidence."  *United States v. Enriquez-Estrada*, 999 F.2d 1355, 1361 (9th Cir. 1993).  Here, the prosecutor simply urged the jury to weigh the testimony of the competing cell tower experts by comparing their qualifications, a common and appropriate component of argument.

Potts contends the statement was improper because "the jury [was] never provided any reviewable evidence displaying either cell tower expert witness' 'qualifications,' 'experience,' and/or 'expertise,' beyond what they do for a living, and

13cv0568

how long they have been employed." (Pet. at 59, ECF No. 1.)  The record belies that claim.  McColl testified he was a radio frequency engineer employed by Verizon since 1994.  (Lodgment No. 2, vol. 5 at 1197.)  His official title was "senior performance engineer."  (*Id.*)  He earned a Bachelor of Science degree from San Diego State University in electrical engineering.  (*Id.*)  His expertise came from his years of work in the area of radio frequency engineering.  (*Id.*)  He was responsible for "maintaining performance in a group of cells in San Diego, including downtown, interstate 8 down to the border, over to about La Mesa . . . ," and as a result he had an "in-depth understanding of how cell phones . . . [and] cell towers work on the Verizon network." (*Id.* at 1198.)

Defense witness Snavely testified he was an electrical engineer who live in Fort Lauderdale, Florida and Alabama.  (Lodgment No. 2, vol. 6 at 1441.)  He had a Bachelor of Science degree in electrical engineering and a Masters of Business Administration.  (*Id.*)  At the time of trial, he was doing graduate work in wireless communication in pursuit of a master's degree in telecommunications.  (*Id.*)  He worked in data communications for Exxon, Bell South Communications which later became AT&T, Northern Telecom, and for the preceding thirteen years owned his own engineering firm.  (*Id.* at 1442.)  As part of his business, he acted as a liaison between wireless communications companies and municipalities for the erection of cell towers and for private companies who had communication interference issues.  (*Id.* at 1444.)  He also held a number of professional licenses related to his work and had attended various industry training courses.  (*Id.* at 1444-45.)  Finally, Snavely discussed some papers he had published on the topic of wireless engineering.  (*Id.* at 1445-47.)

The prosecutor was well within appropriate bounds when he asked the jury to compare the education and experience of these two experts when they evaluated their testimony, and there was plenty of information presented to the jury for them to base this comparison on.  In any event, even if the prosecutor's statement was improper, it did not "so infect . . . the trial with unfairness as to make the resulting conviction a

denial of due process." *Darden*, 477 U.S. at 181.  The evidence of Potts' guilt, though circumstantial, was significant.  Accordingly, after an independent review of the record, the Court concludes the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.  Potts is not entitled to relief as to this claim.

### D.  *Ineffective Assistance of Trial Counsel (claim two)*

Potts argues his trial attorney was ineffective for five reasons.  First, he contends trial counsel  "failed to examine the physical evidence which established the basis of the Third-Party Culpability defense." (Pet. at 4, 29-50, ECF No. 1.)  Second, he claims counsel "failed to produce evidence promised in his opening statement." (*Id.*)  Third, he argues counsel "knowingly lied to the jury during closing argument." (*Id.*)  Fourth, he contends counsel failed to object to the prosecutor vouching for witness McColl during closing argument.  (*Id.*)  And fifth, Potts contends the cumulative effect of counsel's errors resulted in counsel rendering ineffective assistance.  (*Id.* at 50.)  Respondent argues the state court's denial of these claims was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 11-15, ECF No. 16.)

To establish ineffective assistance of counsel, a petitioner must first show his attorney's representation fell below an objective standard of reasonableness. *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687.  He must also show he was prejudiced by counsel's errors. *Id.* at 694.  Prejudice can be demonstrated by a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*; *see also Fretwell v. Lockhart*, 506 U.S. 364, 372 (1993).  Further, *Strickland* requires that "[j]udicial scrutiny of counsel's performance . . . be highly deferential." *Strickland*, 466 U.S. at 689.  There

is a "strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance." *Id.* at 686-87. The Court need not address both the deficiency prong and the prejudice prong if the defendant fails to make a sufficient showing of either one. *Id.* at 697.

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "The standards created by *Strickland* and section 2254(d) are both highly deferential and when the two apply in tandem, review is 'doubly' so." *Harrington v. Richter*, 562 U.S. __, 131 S. Ct. 770, 788 (2011) (citations omitted). These standards are "difficult to meet" and "demand[] that state court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388, 1398 (2011). Federal habeas relief functions as a "guard against extreme malfunctions in the state criminal justice systems," and not simply as a means of error correction. *Richter*, 131 S.Ct. at 786, quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979). "Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process' that the defendant was denied a fair trial." *Strickland*, 466 U.S. at 687.

1. *Failure to Examine the Physical Evidence Supporting the Third Party Liability Defense*

Potts first argues trial counsel was ineffective when he failed to examine the clone of Vienneau's phone before he based his defense on implicating Moen as the murderer. (Pet. at 29-41, ECF No. 1; Traverse at 9-12, ECF No. 21.) Had counsel examined the phone or hired an expert to do so, Potts argues, counsel would have discovered the message timing feature on Vienneau's phone, and, having done so, would not have attempted the third party liability defense focusing on Moen. Instead, trial counsel would have either simply focused on raising a reasonable doubt as to Potts' guilt or would have implicated an unnamed gang member who allegedly bragged about killing Vienneau and Dean. (Pet. at 29-41, 140, ECF No. 1; Traverse at 9-12, ECF No. 21.) Respondent counters that the state court's denial of this claim was

24

1 neither contrary to, nor an unreasonable application of, clearly established Supreme

2 Court law.  (Mem. of P. & A. Supp. Answer at 11-13, ECF No. 16.)

3       Potts raised this first ineffective assistance of counsel subclaim in the habeas

4 corpus petition he filed in the state appellate court in conjunction with his direct appeal.

5 (Lodgment No. 4.)  That court denied the claim in a written opinion denying both the

6 direct appeal and the habeas corpus petition.  (Lodgment No. 6 at 34-42.)  Thus, as to

7 that claim, this Court must "look through" to the state appellate court's decision

8 denying the claim as the basis for its analysis.  *Ylst*, 501 U.S. at 805-06.  In denying this

9 claim, the state appellate court wrote:

10       Assuming, without deciding, defense counsel's performance was
"deficient" when he failed to have a defense expert examine Vienneau's
11   phone before relying on the third party culpability defense involving
Moen, we nonetheless reject Potts's claim he received ineffective
12   assistance of counsel.  (See *People v. Rodrigues*, *supra*, 8 Cal.4th at p.
1126.)  We conclude from Potts's appeal and petition that Potts cannot
13   establish he was prejudiced by counsel's alleged deficient conduct.

14       That is, Potts is unable to show there is a " ' "reasonable probability
that, but for counsel's unprofessional errors, the result of the proceeding
15   would have been different." ' "  (See *People v. Vines*, *supra*, 51 Cal.4th
at pp. 875-876.)  Indeed, on this record, it is quite possible that if Potts's
16   counsel had hired an expert to examine Vienneau's phone (or clone of it),
the expert would have found strong evidence of Potts's guilt.

17       In any event, Potts's third party liability defense theory involving
18   Moen was, as defense counsel noted in closing, "extremely complicated"
on the facts of this case.  We fully agree with that assessment, based on
19   our independent review of the record on appeal and the "evidence"
proffered by Potts in support of his petition.

20       Although this defense was "extremely complicated" as it related to
21   Moen, the record shows it was at least viable, inasmuch as semen and low
levels of spermatozoa matching Moen's DNA were found in Vienneau's
22   vagina at the time of her death.  Also, there is substantial evidence in the
record that Moen was in love with Vienneau but that Vienneau *may* not
23   have felt the same way about Moen, that Vienneau and Moen had
disagreed shortly before her murder about whether Potts should be
24   allowed to visit with Vienneau's son, and that two days before her murder,
Vienneau had told Moen that she was spending time with an old
25   boyfriend, which the defense claimed enraged the jealous Moen.

26       In addition, the evidence in the record strongly supports the
27   conclusion that Vienneau knew her attacker, supporting the defense's
theory that Moen allegedly was the murderer and undermining the theory
28   that a stranger/gang member was responsible for the crime.

13cv0568

Indeed, the apartment complex where Vienneau and Dean were living was gated and secured. The apartment itself was located on the third floor of the complex and there was a steep drop from the apartment to the ground. Thus, to gain entrance to the apartment, the attacker likely came through the front door, which had a working peephole. There was also no sign of forced entry or a struggle between Vienneau and her attacker.

As to the lack of any evidence of forced entry or struggle, police noticed the only furniture displaced in the living room was a child's stool. Tricia testified that from inside her bedroom with her door closed, she typically could hear conversations emanating from her sister's room and/or the living room. The evidence in the record thus supports the inference that if the attacker had surprised Vienneau and forced his way inside the apartment, Tricia would have been awakened by the noise from the attack and/or by Vienneau and her pleas for help.

Potts's theory that Vienneau was killed by a gang member also does not account for the murder of Baby Dean, as noted by the trial court. At the time of the attack, Dean was just 10 months old and was inside his playpen in Autumn's room, away from the scene of the attack on his mother. If, as the defense now contends, Vienneau was the victim of an attempted sexual assault by a complete stranger, whey then would her attacker also kill Dean? Also, why would the attacker entered Autumn's room, where Dean was located, but not enter[] Tricia's room where Tricia was sleeping in front of her television? After all, a 10-month-old child cannot testify in court or identify his mother's attacker, but Tricia certainly could.

Potts's gang theory also does not explain why text messages exchanged between Potts and Vienneau on the day she was murdered were deleted from Vienneau's phone and why, ostensibly after she was murdered, Moen continued to receive text messages from Vienneau's phone, including a message that Dean was "sleeping like a dead dog." In addition, the content of some of the messages Moen received from Vienneau that Moen testified seemed "fishy" suggested the attacker knew Vienneau and Moen were friends and/or in a relationship, which further undermined the theory that Vienneau was killed by a complete stranger.

In contrast, there is nothing in the record on appeal or in the petition suggesting that at the time defense counsel allegedly erred by focusing suspicion on Moen (see *Strickland v. Washington*, *supra*, 466 U.S. at p. 689 [an attorney's performance "requires that every effort be made to eliminate the distorting effects of hindsight"]), the gang member theory was even viable, much less a better option than the theory involving Moen. The petition contains only vague statements by Potts's former defense counsel about some alleged evidence involving an unidentified gang member allegedly bragging about to some unidentified third person about killing Vienneau and her son.

Based on the complete absence of any evidence in the record on appeal and in the petition showing Potts was prejudiced by his counsel's (alleged) tactical blunder in focusing suspicion on Moen and not a complete stranger, we reject Potts's claim he was denied effective assistance of counsel.

Finally we conclude the overwhelming evidence of Potts's guilt allayed any prejudice Potts *may* have suffered from his counsel's (alleged) tactical error in blaming Moen and not a complete stranger for the murders. (Cf. *People v. Slaughter* (2002) 27 Cal.4th 1187, 1219; *People v. Ledesma* (1987) 43 Cal.3d 171, 215-218.)

The evidence in the record shows, among other things, Potts was upset when Vienneau threatened to take him to court for paternity testing because she suspected (ultimately correctly) that Potts had tampered with the mail-in tests showing he was not Dean's father; Potts submitted Max's DNA for testing and not his own because Potts did not want to be the father of, or pay child support for, Dean; Potts had never told his parents or his fiancé about Vienneau, Dean and the possibility that he could be Dean's father because Potts believed that if that were true, it would ruin his life; Potts conducted myriad searches on the Internet — which he unsuccessfully attempted to delete from his computer — concerning murder and getting away with murder, performing choke holds and knocking people unconscious; Vienneau told her mother, friends and roommates days before, and on the day, she was murdered she and Potts were having dinner that night; a few days before her murder, Vienneau called Bohrer and asked Bohrer if she was available to babysit Dean on July 26 because Vienneau and Potts planned to have dinner together that evening; minutes before Vienneau's murder, Bohrer called and Vienneau confirmed she would be dropping off Dean shortly at Bohrer's apartment; on the night of her murder, Vienneau intended in "no uncertain terms" to tell Potts she would be seeking a court-ordered paternity test to determine if Potts was Dean's father; on the day she was murdered, Vienneau and Potts exchanged 26 text messages, including several messages shortly before Vienneau was murdered; in some of these messages — including those recovered by experts from Vienneau's cell phone sent from Potts's phone — he inquired of Vienneau whether she was alone in the apartment; before police confronted Potts with the cell phone evidence, Potts maintained he had not texted Vienneau on the day she was murdered and he had received only one message from Vienneau that same day; hours before she was murdered, Vienneau texted Potts confirming their dinner plans that evening and stating she was excited about the "surprise" Potts promised her; records show Potts called Vienneau's cell phone shortly before the murders; the cell tower evidence supports the finding that at 6:44 p.m. on the night of the murders, Potts was not at Max's residence; after the murders, Potts downloaded to his computer about 20 pages of cell phone records and altered on page 17 of those records *only* two entries concerning calls at 5:39 and 6:44 p.m. on the night Vienneau was murdered; Potts told police during police interviews that before her murder, Vienneau and not Potts had cancelled their tentative plans to see each other; on the day she was murdered, Vienneau asked her mother if the clothes Vienneau intended to wear to dinner with Potts that evening were appropriate; and Potts claimed he went to Max's house between 5:00 and 8:00 p.m. on the night Vienneau was murdered because his own computer lacked software to view surveillance video taken of the Potts family home (in connection with newspapers being stolen from the house), even though Potts's computer had software installed on it that could view the video and was superior to the software available to Max.

On this record, we conclude there was no "reasonable probability" that, but for defense counsel's alleged deficiency in failing to have an

1    expert examine Vienneau's cell phone before the defense accused Moen
     of the murders, the result would have been more favorable to Potts. (See
2    *People v. Vines*, *supra*, 51 Cal.4th at pp. 875-876.) As such, we conclude
     Potts failed to establish the requisite prejudice for purposes of his claim
3    of ineffective assistance of counsel.

4    (Lodgment No. 6 at 37-42.)

5        Potts argues counsel should have examined Vienneau's phone before mounting

6    the third party liability defense, and his failure to conduct a reasonable investigation

7    of the basis for the defense violated *Strickland*. As *Strickland* notes, however, every

8    effort must be made "to reconstruct the circumstances of counsel's challenged conduct,

9    and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466

10   U.S. at 689. In Potts' case, counsel was confronted with an extremely difficult set of

11   facts pointing to Potts' guilt. Potts admitted he had had a sexual relationship with

12   Vienneau, had hidden his relationship with Vienneau from his parents and fiancé, and

13   had faked two paternity tests. (Lodgment No. 2, vol. 9 at 1711-23.) This provided a

14   motive for the murders, particularly the murder of Dean who could not have identified

15   Vienneau's killer and who a stranger would not have necessarily known was in the

16   other room. Cell tower evidence showed Potts was near Vienneau's apartment at the

17   time the murders were committed, contrary to his claim that he was at his friend Max

18   Corn's house, which provided opportunity. (Lodgment No. 2, vol. 7 at 1230.)

19   Evidence also established Potts had attempted to eliminate evidence implicating him

20   in the murders, which tended to show consciousness of guilt. Potts altered cell phone

21   records to show he was at Corn's house, not Vienneau's apartment, at the time of the

22   murders. (*Id.* at 1304-10.) Potts also deleted text messages between himself and

23   Vienneau that contradicted his statements to police, and attempted to delete internet

24   searches about getting away with murder, knocking people unconscious, avoiding child

25   support, and using a choke hold. (Lodgment No. 2, vol. 6 at 1108-13, 1140-43.) The

26   text messages, in which Potts asked Vienneau if she was alone, and the computer

27   searches also indicated planning of the murders. Finally, the fact that there was no

28

13cv0568

evidence of a struggle or forced entry into Vienneau's apartment indicated Vienneau knew her killer.  (Lodgment No. 2, vol. 4 at 477-502, 511-12.)

These facts severely narrowed the possible defenses counsel could have mounted, and under the circumstances, focusing on Moen as the killer was a sound strategic decision.  Moreover, there was evidence supporting this choice.  Witnesses testified Moen was in love with Vienneau and that Vienneau may not have reciprocated Moen's feelings.  (Lodgment No. 2, vol. 9 at 1685-89.)  Sperm matching Moen's DNA was found inside Vienneau's vagina.  (Lodgment No. 2, vol. 4 at 602-03.)  Moen admitted he had left work for a short period of time around the time the murders were committed, and the surveillance tape at Moen's work was not turned on until 6:40 p.m., sometime after the murders likely took place.  (Lodgment No. 2, vol. 5 at 677, 734.)  The one stumbling block was the text messages sent from Vienneau's phone to Moen which occurred after the murders took place and which Moen was seen reading on the surveillance video tape from his workplace.  But counsel reasonably proceeded with the third party liability defense focused on Moen anyway, because based on discovery provided by the prosecution, counsel determined the prosecutor could not firmly establish what time the text messages were *sent* from Vienneau's phone, only when Moen read the messages.  *Richter* helps place counsel's decision to move ahead with the Moen third party liability defense based on these facts in perspective:

> Representation is constitutionally ineffective only if it 'so undermined the proper functioning of the adversarial process" that the defendant was denied a fair trial.  *Strickland*, *supra*, at 686 [citation omitted].  Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities.
>
> Here, Richter's attorney was mistaken in thinking the prosecution would not present forensic testimony.  But the prosecution itself did not expect to make that presentation and had made no preparations for doing so on the eve of trial.  For this reason alone, it is at least debatable whether counsel's error was so fundamental as to call the fairness of the trial into doubt.

*Richter*, 131 S.Ct. at 791.

29

13cv0568

Similarly, trial counsel in Potts' case was mistaken in believing the prosecutor could not prove when the text messages were sent from Vienneau's phone, and indeed the prosecutor himself was unaware of this evidence until counsel mounted a vigorous presentation on behalf of Potts.  As in *Richter*, "[f]or this reason alone, it is at least debatable whether counsel's error was so fundamental as to call the fairness of the trial into doubt." *Id.*

Potts frames the inquiry as follows: Did trial counsel reasonably rely on the prosecution's evaluation of Vienneau's phone instead of conducting his own investigation?  But one must also ask: What would counsel have discovered had he conducted his own investigation and what would he have been able to do with that information?   Had a defense expert examined Vienneau's phone he may have discovered, before the prosecution did, the feature which recorded when text messages were sent. (Pet. at 40, ECF No. 1.)  But the discovery of the message timing feature on Vienneau's phone would not have assisted Potts; rather it would have, *if also discovered by the prosecution*, cut against Potts' only viable defense.  The prosecution had every incentive to thoroughly investigate the phone's messaging capabilities and discover the message timing feature.  Counsel's decision to rely on the prosecution's investigation of the phone was reasonable under the circumstances.  As the Supreme Court has noted, "[t]he question 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable — a substantially higher threshold.'" *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007).  Thus, the question is not "whether counsel's actions were reasonable" but "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Hibler v. Benedetti*, 693 F.3d 1140, 1150 (9th Cir. 2012) (quoting *Richter*, 131 S.Ct. at 788).  "Accordingly, a 'doubly deferential judicial review' applies to Strickland claims rejected by the state court." *Id*. (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009).  Here, Potts has not established that there was

1  no reasonable argument in support of the  state court's determination with respect to

2  effective assistance of counsel.

3       Potts has not satisfied the prejudice prong of *Strickland* for the same reason.

4  Potts claims that had counsel discovered the message timing feature of Vienneau's

5  phone he would have abandoned his focus on Moen and elected instead to either

6  simply raise a reasonable doubt about Potts' guilt or argue an unnamed gang member

7  murdered Vienneau and Dean.  (Pet. at 40-42, ECF No. 1.)  Potts has submitted a

8  declaration from trial counsel in support of the petition stating that "[i]n the  discovery

9  provided to me by the District Attorney's office long before trial, I learned that a gang

10 member who lived somewhat near to Tori V's apartment had bragged to at least one

11 other person about killing Tori and Dean shortly after the murders." (*Id.* at 140.) Potts

12 claims had counsel discovered the message timing feature of Vienneau's phone and

13 altered his defense theory, "[i]t is reasonably probable the jury would have either

14 believed the evidence regarding the gang member, or that at least one juror would have

15 not been convinced of Petitioner's guilt beyond a reasonable doubt." (*Id.* at 41.)  As

16 detailed above and by the state appellate court, the evidence of Potts' guilt, although

17 circumstantial, was quite strong.  After hiding his relationship with Vienneau from his

18 family and fiancé, Potts faked two paternity tests in an effort to avoid responsibility for

19 his paternity of Dean. (Lodgment No. 2, vol. 9 at 1720-23.) When Vienneau suspected

20 Potts had faked the tests, she told Potts, friends and family she planned on taking him

21 to court for a court ordered paternity test. (Lodgment No. 2, vol. 3 at 314, 415.) Potts

22 was very angry and upset about Vienneau's intent to take him to court. (*Id.* at 369,

23 416-17.) Vienneau's mother testified Vienneau told her Potts' life would be "ruined"

24 if the truth about she and Dean were revealed.  (Lodgment No. 2, vol. 9 at 1695.)

25 Shortly before Vienneau's murder, Potts conducted searches on his computer for topics

26 including "getting away with murder," "knocking someone unconscious," "avoiding

27 child support," and "using a choke hold"; Potts then tried to delete those searches from

28 his computer. (Lodgment No. 2, vol. 6 at 1140-43.)  Potts claimed to be at his friend

Max Corn's house during the murder, but cell phone records indicated his phone "pinged" off a tower only .6 miles from Vienneau's apartment at approximately the time the murders were committed.  (Lodgment No. 2, vol. 7 at 1304-10.)  Text messages between Potts and Vienneau sent and received just prior to the murders during which Potts' and Vienneau's plans for the evening of the murders were discussed were deleted from Vienneau's phone, and Potts asked Vienneau in several of these texts whether she was alone.  (Lodgment No. 2, vol. 6 at 1108-13.)  Vienneau told her mother and friends she planned to have dinner with Potts the night of her murder to discuss and a court-ordered paternity test.  (Lodgment No. 2, vol. 3 at 312, 417-20, vol. 9 at 1694.)

There was no evidence of forced entry into the apartment nor evidence of a struggle inside the apartment, nor did Vienneau's roommate awaken during the murder, suggesting Vienneau knew her killer and therefore the killer was not the unnamed gang member.  (Lodgment No. 2, vol. 4 at 477-502, 511-12.)  In addition, the murder of Dean was consistent with Potts' desire to rid himself of Vienneau and their son, as a stranger would not have known Dean was in the other room, nor would he have been likely to kill Dean as Dean could not have identified the killer.  After the murders, Potts attempted to alter his cell phone records to show the call which pinged off the cell tower close to Vienneau's apartment instead pinged off the cell tower close to Corn's house, consistent with his alibi.  (Lodgment No. 2, vol. 7 at 1230.)  One of the text messages Moen thought was suspicious and police thought was sent by the killer, which stated "Duh" in response to Moen's text, was similar to a text response from Potts which Potts deleted from Vienneau's phone.  (Lodgment No. 2, vol. 3 at 694-95, vol. 6 at 1143.)  Potts also lied to the police about the paternity issue and his relationship with Vienneau.  (Lodgment No. 2, vol. 6 at 1002-16.)

In short, Potts had a clear motive and opportunity to commit the murders, attempted to destroy and alter evidence indicative of his guilt, and lied to police about his contact with Vienneau and the paternity tests he faked when questioned about

13cv0568

Vienneau's murder.  It is not reasonably probable the jury would have found Potts not guilty, or that they would not have been convinced of his guilt beyond a reasonable doubt, had counsel presented a third party liability defense focused on the unnamed gang member as the perpetrator of the murders.  *Strickland*, 466 U.S. at 697.  Accordingly, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Williams*, 529 U.S. at 412-13.  Potts is not entitled to relief as to this claim.

## 2. *Failure to Produce Evidence as Promised in Opening Statement*

Potts next faults counsel for "assur[ing] the jury members that the defense would show them — in the course of the proceedings — that Daniel Moen had [a] clear opportunity to commit the double homicide [which] placed an unnecessary affirmative duty upon the shoulders of his defense to produce such."  (Pet. at 43, ECF No. 1.) Respondent argues the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of P. & A. Supp. Answer at 13-14, ECF No. 16.)

Potts raised this claim only in the second habeas corpus petition he filed in the California Supreme Court following the denial of his direct appeal.  (Lodgment No. 9.) The California Supreme Court denied the petition without citation of authority. (Lodgment No. 10.)  Thus, this Court must conduct an independent review of the record to determine whether that denial was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

Counsel did not shift the burden of proof to the defense by outlining his defense strategy in his opening statement as Potts suggests.  As discussed above in section IV(D)(1) of this Report and Recommendation, in the face of a large amount of incriminating circumstantial evidence implicating Potts in the murders, counsel reasonably made a strategic decision to implicate Moen as the killer instead.  As *Strickland* notes, every effort must be made "to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective

13cv0568

at the time." *Strickland*, 466 U.S. at 689.  By outlining the defense theory, counsel simply did what all lawyers do in opening statements, that is, provide a road map to the jury as how counsel believes the evidence will be presented and what counsel believes the evidence will show.  The fact that new evidence came to light mid-trial which called into question the defense theory does not render counsel's performance ineffective. *Strickland*, 466 U.S. at 687.

Potts also has not established he was prejudiced by any actions of counsel because he has not shown "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694; *see also Fretwell*, 506 U.S. at 372.  Potts has provided no evidence showing that, had counsel not forcefully asserted that Moen had the opportunity to commit the murders, the jury would have come to a different conclusion about his guilt. *Strickland*, 466 U.S. at 694.

Following an independent review of the record, the Court concludes the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Himes*, 336 F.3d at 853.  Accordingly, Potts is not entitled to relief as to this claim.

### 3. *Knowingly Lying to the Jury During Closing Argument*

Potts next contends counsel lied to the jury during closing argument. Specifically, Potts complains that counsel continued to pursue the theory that Moen could have committed the murders despite the text message timing evidence which showed Moen on video tape at his workplace shortly after the murders were committed. (Pet. at 45-50, ECF No. 1.)  According to Potts, this damaged the credibility of the defense irreparably because it essentially asked the jury to "abandon all common-sense, ignore the newly-introduced evidence of which they had been shown, and find it plausible Mr. Moen had nonetheless been the likely killer of Tori and Dean." (*Id.* at 47.)  Respondent counters the state court's denial of this claim was neither contrary to,

1  nor an unreasonable application of, clearly established Supreme Court law.  (Mem. of
2  P. & A. Supp. Answer at 14, ECF No. 16.)

3        Potts raised this claim only in the second habeas corpus petition he filed in the
4  California Supreme Court following the denial of his direct appeal.  (Lodgment No. 9.)
5  The California Supreme Court denied the petition without citation of authority.
6  (Lodgment No. 10.)  Thus, this Court must conduct an independent review of the
7  record to determine whether that denial was contrary to, or an unreasonable application
8  of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

9        Potts contends counsel should have responded to the newly discovered evidence
10 by emphasizing Potts' alibi defense instead of continuing to insist that Moen had the
11 opportunity and motive to kill Vienneau and Dean.  (Pet. at 47, ECF No. 1.)  But the
12 alibi defense had problems as well, notably, the cell tower "pings" which showed Potts
13 was near Vienneau's apartment at the time of the murders and not Corn's house.
14 (Lodgment No. 2, vol. 7 at 1216-19, 1230.)  The incriminatory nature of the cell tower
15 evidence was compounded by Potts' attempts to alter his cell phone records to support
16 his alibi, as well as the deleted texts from Vienneau's phone which established Potts
17 and Vienneau had plans the night of the murders and Potts' attempt to determine
18 whether she was alone.  (Lodgment No. 2, vol. 6 at 1143-44; vol. 7 at 1304-12.)  Under
19 these circumstances, it was a reasonable, strategic decision for counsel to forge ahead
20 with the defense theory about Moen.  *Strickland*, 466 U.S. at 688.

21       In any event, Potts has not established he was prejudiced by counsel's actions.
22 *Id*. at 693-94.  As set forth more fully above, the circumstantial evidence against Potts
23 was strong.  He had a strong motive to kill Vienneau *and* their son, and in fact, no other
24 plausible person had the motive to kill the baby.  Potts' actions showed a consciousness
25 of guilt, specifically, lying about the  paternity tests, altering his cell phone records,
26 deleting his incriminating computer searches, and deleting texts between he and
27 Vienneau.  The evidence also showed Potts had the opportunity to commit the murders,
28 including the evidence that his cell phone "pinged" off a cell tower near Vienneau's

13cv0568

apartment at the time the murders were committed.   In short, given the evidence presented to the jury, had counsel emphasized Potts' alibi or suggested some other individual besides Moen or Potts was the murderer, the Court is confident jury's verdict would have been the same.

Accordingly, after an independent review of the record, the Court concludes the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.  Potts is not entitled to relief as to this claim.

4. *Failure to Object to Prosecutor's Vouching for the Credibility of a Witness*

Finally, Potts contends trial counsel was ineffective when he failed to object to the prosecutor vouching for the prosecution's cell tower expert, McColl.  (Pet. at 5, 31, 48-50, ECF No. 1.)  Respondent argues the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. of Answer at 13-15, ECF No. 16.)

Potts raised this claim only in the second habeas corpus petition he filed in the California Supreme Court following the denial of his direct appeal.  (Lodgment No. 9.) The California Supreme Court denied the petition without citation of authority. (Lodgment No. 10.)   Thus, this Court must conduct an independent review of the record to determine whether that denial was contrary to, or an unreasonable application of, clearly established Supreme Court law.  *Himes*, 336 F.3d at 853.

As discussed in section IV(C) of this R&R, the Court has concluded the prosecutor did not vouch for the credibility of his expert witness.  As such, trial counsel was not ineffective for failing to object.  Potts has neither established counsel was ineffective, because there was no basis for an objection,  nor that he was prejudiced by counsel's failure, because he has not shown that had counsel made the objection it would have affected the outcome of his case.  *Strickland*, 466 U.S. at 688, 697. Accordingly, Potts is not entitled to relief as to this claim.  *Himes*, 336 F.3d at 853. //

5. *Cumulative Ineffective Assistance of Counsel*

On page 50 of his petition, Potts argues that "even if any individual error raised herein does not rise to the level of ineffective assistance sufficient to grant the relief sought, then cumulatively the errors do." (Pet. at 50, ECF No. 1.) This claim has never been presented to any state court, which would normally preclude review. *See Rose v. Lundy*, 455 U.S. 509, 522 (1982). It is clear, however, that were Potts to present the claim to the California Supreme Court in a habeas corpus petition, the state court would reject it as untimely. *See In re Robbins*, 18 Cal. 4th 770, 814-15 (1998). In cases like these, the Ninth Circuit has held such claims are "technically exhausted," but procedurally defaulted if the procedural rule that would be imposed is independent and adequate. *Cooper v. Neven*, 641 F.3d 322, 327 (9th Cir. 2011). The United States Supreme Court found California's timeliness rule independent and adequate in *Walker v. Martin*, 562 U.S. __, 131 S. Ct. 1120, 1128 (2011). Accordingly, the Court concludes Potts' claim of cumulative ineffective assistance of counsel is technically exhausted. The claim is, however, procedurally defaulted under *Robbins* unless Potts can establish cause for the default and prejudice resulting from it, or that "failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Established precedent in this Circuit dictates that a court's decision on the issue of procedural default is to be informed by furthering "the interests of comity, federalism, and judicial efficiency." *Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998). Thus where, as here, deciding the merits of a claim proves to be less complicated and less time-consuming than adjudicating the issue of procedural default, a court may exercise discretion in its management of the case to reject the claims on their merits and forgo an analysis of cause and prejudice. *Batchelor v. Cupp*, 693 F.2d 859, 864 (9th Cir. 1982). Because there is no state court decision on this claim to which this Court can defer, the Court must conduct a *de novo* review of the claim. *Pirtle v. Morgan*, 313 F.3d 1160, 1167 (9th Cir. 2003).

"Cumulative error applies where, 'although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant.'" *Mancuso v. Olivarez*, 292 F.3d 939, 958 (9th Cir. 2002) (quoting *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996). The Court concluded in section IV(D) of this Report and Recommendation that counsel did not render ineffective assistance. Because the Court has concluded no errors occurred, no cumulative error occurred. The Court has also considered the cumulative impact of counsel's decisions and finds no prejudice. *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986) (stating that "[i]t will generally be appropriate for a reviewing court to assess counsel's overall performance throughout the case in order to determine whether the 'identified acts of omissions' overcome th presumption that a counsel rendered reasonable professional assistance") (quoting *Strickland*, 466 U.S. at 689.) Accordingly, he is not entitled to relief as to this claim.

E. *Ineffective Assistance of Appellate Counsel (claim three)*

In claim three, Potts alleges appellate counsel rendered ineffective assistance in two ways. First, Potts contends appellate counsel should have alleged trial counsel was ineffective when he failed to produce evidence that Moen killed Vienneau and Dean despite having promised to do so in his opening statement. Second, Potts argues appellate counsel should have alleged trial counsel was ineffective when he failed to object to the prosecution's vouching for McColl during closing argument. (Pet. at 5, 51-54, ECF No. 1.) Respondent counters that the state court's rejection of this claim was neither contrary to nor an unreasonable application of, clearly established Supreme Court law. (Mem. of P. & A. Supp. Answer at 15-17, ECF No. 16.)

Potts raised these claims only in the second habeas corpus petition he filed in the California Supreme Court following the denial of his direct appeal. (Lodgment No. 9 at 4, 23-27.) The California Supreme Court denied the petition without citation of authority. (Lodgment No. 10.) Accordingly, this Court must conduct an independent review of the record to determine whether that denial was contrary to, or an

unreasonable application of, clearly established Supreme Court law. *Himes*, 336 F.3d at 853.

The *Strickland* test applies to ineffective assistance of appellate counsel claims. *Smith v. Robbins*, 528 U.S. 259, 285 (2000) (citing *Smith v. Murray*, 477 U.S. 527, 535-36 (1986)). A petitioner must first show that his appellate counsel's performance fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 688. He must then establish he was prejudiced by counsel's errors. *Id.* at 694. To establish prejudice, a petitioner must demonstrate that he would have prevailed on appeal absent counsel's errors. *Smith*, 528 U.S. at 285. Appellate counsel is not required to raise frivolous or meritless claims on appeal. *Jones v. Ryan*, 691 F.3d 1093, 1101 (9th Cir. 2012).

As to Potts' first claim of error — that appellate counsel should have alleged trial counsel was ineffective when he failed to produce evidence that Moen committed the murders, as promised in his opening statement — this Court has already determined in section IV(D)(3) of this Report and Recommendation that trial counsel was not ineffective when he failed to produce evidence promised during opening statement. Accordingly, appellate counsel's failure to present that claim was not objectively unreasonable because it had no merit. *Jones*, 691 F.3d at 1101. In addition, Potts has not established he was prejudiced by appellate counsel's failure to present because he has not shown he would have prevailed on that issue on appeal had it been presented. *Smith*, 528 U.S. at 285.

With regard to Pott's claim that appellate counsel should have alleged that trial counsel was ineffective when he failed to object to statements made by the prosecutor during closing argument as improper vouching, as this Court concluded in section IV(D)(4) the prosecutor's statements were not vouching. Therefore, trial counsel was not ineffective for failing to object, and Potts was not prejudiced by counsel's failure to object. *Strickland*, 466 U.S. at 688, 694. Thus, appellate counsel cannot be faulted for failing to raise this claim. *Jones*, 691 F.3d at 1101.

13cv0568

For all the foregoing reasons, the state court's denial of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court law. *Williams*, 529 U.S. at 412-13.  Potts is not entitled to relief as to this claim.

F. *Evidentiary Hearing*

On page 62 of Potts' petition, he asks this Court to conduct an evidentiary hearing on his claims.  (Pet. 62, ECF No. 1.)  Evidentiary hearings in § 2254 cases are governed by AEDPA, which "substantially restricts the district court's discretion to grant an evidentiary hearing." *Baja v. Ducharme*, 187 F.3d 1075, 1077 (9th Cir. 1999). The provisions of 28 U.S.C. § 2254(e)(2) control this decision:

> (2) If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
>
> (A) the claim relies on –
>
> > (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
> >
> > (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
>
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for the constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C.A. § 2254(e)(2) (West 2006).

In order to determine whether to grant an evidentiary hearing, the court must first "determine whether a factual basis exists in the record to support the petitioner's claim." *Insyxiengmay v. Morgan*, 403 F.3d 657, 669 (9th Cir. 2005) (citing *Baja*, 187 F.3d at 1078).  If not, the court must "ascertain whether the petitioner has 'failed to develop the factual basis of the claim in State court.'" *Id.* at 669-70.  A failure to develop the factual basis of a claim in state court implies "some lack of diligence, or some greater fault, attributable to the prisoner or the prisoner's counsel." *See Williams v. Taylor*, 529 U.S. 420, 432 (2000).  The Supreme Court has said that "[d]iligence will

require in the usual case that the prisoner, at a minimum, seek an evidentiary hearing in state court in the manner prescribed by state law." *Id.* at 437.

Pursuant to *Cullen v. Pinholster*, 563 U.S. ___, 131 S. Ct. 1388, 1402 (2011), Potts is limited to the facts presented to the state court. In *Pinholster*, the Supreme Court held that where habeas claims have been decided on their merits in state court, a federal court's review must be confined to the record that was before the state court. *Id.* at 1398. Potts can only proceed to develop additional evidence in federal court if either § 2254(d)(1) or (d)(2) is first satisfied. *See Sully v. Ayers*, 725 F.3d 1057, 1076 (9th Cir. 2013) (stating that "an evidentiary hearing is pointless once the district court has determined that § 2254(d) precludes habeas relief" and citing *Pinholster*, 131 S.Ct. at 1411, n. 20). It has not been here for all the reasons discussed above. Accordingly, the Court recommends Potts' request for an evidentiary hearing be **DENIED**.

G.  *Request to Appoint Counsel*

Potts also asks to be appointed counsel. (Pet. at 62, ECF No. 1.) The Sixth Amendment right to counsel does not extend to federal habeas corpus actions by state prisoners. *McCleskey v. Zant*, 499 U.S. 467, 495 (1991); *Chaney v. Lewis*, 801 F.2d 1191, 1196 (9th Cir. 1986); *Knaubert v. Goldsmith*, 791 F.2d 722, 728 (9th Cir. 1986). However, financially eligible habeas petitioners seeking relief pursuant to 28 U.S.C. § 2254 may obtain representation whenever the court "determines that the interests of justice so require.'" 18 U.S.C. § 3006A(a)(2)(B) (West Supp. 2007); *Terrovona v. Kincheloe*, 912 F.2d 1176, 1181 (9th Cir. 1990); *Bashor v. Risley*, 730 F.2d 1228, 1234 (9th Cir. 1984).

The appointment of counsel is discretionary when no evidentiary hearing is necessary. *Terrovona*, 912 F.2d at 1177; *Knaubert*, 791 F.2d at 728. In the Ninth Circuit, "[i]ndigent state prisoners applying for habeas relief are not entitled to appointed counsel unless the circumstances of a particular case indicate that appointed counsel is necessary to prevent due process violations." *Chaney*, 801 F.2d at 1196; *Knaubert*, 791 F.2d at 728-29. Factors to be considered are the likelihood of success

on the merits and whether the issues involved are too complex for the petitioner. *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983).  In addition, the appointment of counsel may be necessary if the petitioner has such limited education that he or she is incapable of presenting his or her claims. *La Mere v. Risley*, 877 F.2d 622, 626 (9th Cir. 1987).  Here, Petitioner has sufficiently represented himself to date.  From the face of the petition, filed pro se, it appears that Petitioner has a good grasp of this case and the legal issues involved.  Under such circumstances, a district court does not abuse its discretion in denying a state prisoner's request for appointment of counsel as it is simply not warranted by the interests of justice.  *See id.*  Accordingly the Court **DENIES** the request for the appointment of counsel.

## V.    CONCLUSION

The Court submits this Report and Recommendation to United States District Judge Dana M. Sabraw under 28 U.S.C. § 636(b)(1) and Local Civil Rule 72.1(d)(4) of the United States District Court for the Southern District of California. For the reasons outlined above, the Court **DENIES** Petitioner's request for appointment of counsel.

In addition, **IT IS HEREBY RECOMMENDED** that the Court issue an order: (1) approving and adopting this Report and Recommendation, and (2) directing that Judgment be entered **DENYING** the request for an evidentiary hearing and **DENYING** Petition for Writ of Habeas Corpus.

**IT IS ORDERED** that no later than **August 29, 2014** any party to this action may file written objections with the Court and serve a copy on all parties. The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **September 19, 2014**. The parties are advised that failure to file objections within the specified time may waive the right to

///

///

13cv0568

raise those objections on appeal of the Court's order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

**DATED:  August 7, 2014**

**JILL L. BURKHARDT**
**United States Magistrate Judge**

13cv0568